Filed 9/30/15  The Sierra Club v. City and County of San Francisco CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE SIERRA CLUB,<br><br>        Petitioner and Appellant,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.<br><br>        Real Parties in Interest and Respondents.<br><br>CITY FIELDS FOUNDATION et al.,<br><br>        Intervenor and Respondent. | A140891<br><br>(San Francisco County<br>Super. Ct. No. CPF-12-512566) |

**INTRODUCTION**

This appeal challenges the decision of the Board of Supervisors for the City and County of San Francisco (City) to certify the environmental impact report (EIR) for the Beach Chalet Athletic Fields Renovation Project (the project or Beach Chalet project), a sports field renovation project in Golden Gate Park.  The proposed renovation includes replacing the existing grass turf fields with synthetic turf fields, installing field lighting, and other site modifications intended to improve the overall conditions of the facility and increase the amount of play time on the athletic fields.  Petitioners filed a complaint for declaratory and injunctive relief and sought a writ of mandate in the trial court, contending, inter alia, that the EIR for the project was inadequate under the California

1

Environmental Quality Act, Public Resources Code section 21000 et seq.[1] (CEQA). After a bench trial on the merits, the trial court dismissed the complaint and denied the petition.

On appeal, petitioners argue that the EIR violated CEQA by failing to disclose and mitigate significant health risks associated with the styrene butadiene rubber crumb infill component of the proposed synthetic turf, and by failing to analyze and consider alternatives to the project that would have met most of the project goals while eliminating significant environmental impacts. Petitioners also contend the trial court erred in limiting the administrative record and sustaining without leave to amend a demurrer to their CEQA claim that the City failed to exercise its independent judgment in allowing intervenor City Fields Foundation (the Foundation) to choose the synthetic turf for the project.

Finding no error, we will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Beach Chalet Athletic Fields Renovation Project*

The San Francisco Recreation and Parks Department (SFRPD), the project sponsor, is proposing to renovate the Beach Chalet Athletic Fields facility (facility), an approximately 9.4 acre public sports field that was built 75 years ago along the western edge of Golden Gate Park. The facility includes four grass turf athletic fields, a parking lot, a restroom building, and a maintenance shed. Golden Gate Park is the fifth most visited park in the country and is listed on the National Register of Historic Places and the California Register of Historical Resources as a historic district. Both the athletic fields and the restroom building at the project site are listed as contributing features of the historic district.

The facility is one of three primary ground sports athletic facilities in San Francisco. To allow the natural grass turf to rest and regrow, only three out of the four athletic fields are open at any one time, and all four fields are closed to the public for

_____

[1] All further undesignated statutory references are to the Public Resources Code.

2

three to four months in the fall and winter. The fields are also closed to the public on Mondays throughout the year for maintenance. The fields are open until dark Tuesday through Sunday, and are closed during and following rain events. According to SFRPD, "the fields are subject to heavy use and are characterized by abundant gopher holes and year-round wet conditions, are considered to be in poor condition, and require a considerable amount of maintenance."

The project would include replacing the four natural grass turf fields with synthetic turf, installing field lighting, renovating the existing restroom building, installing player benches and seating, and constructing a plaza area with seating. A playground, picnic tables, and barbecue pits would be added, as would two access paths from the plaza area to the playing fields. The parking lot would be renovated and expanded to include a drop-off area and an additional 20 parking spaces for a total of 70 spaces. A new concrete pathway would encircle the four playing fields and connect with existing pedestrian circulation routes within the park and to the pathway at the nearby Great Highway.

In their current condition, the fields accommodate approximately 4,738 hours of annual play. Installation of synthetic turf would allow for use of the fields in wet weather conditions and eliminate the need for rest and regrowth periods. Installation of lighting would allow for longer evening use of the fields. The proposed project would add approximately 9,582 additional hours per year of play time, for a total of 14,320 hours of annual play, an increase of more than 200 percent over existing conditions.

B. *The City's Partnership with the Foundation*

In 2006, the City and the Foundation entered into a Memorandum of Understanding (MOU) to partner together in upgrading athletic playing fields in the City. In partnership with the Foundation, the City has installed 14 synthetic turf athletic fields in seven parks throughout San Francisco.[2] This has added approximately 37,000 new

---

[2] We are advised by the City that, in September 2014, after the administrative record was closed, two new turf fields opened at the Minnie and Lovie Ward Recreation

hours of play capacity annually to San Francisco's public soccer fields, enabling 1,800 more San Francisco children to play soccer. The 14 existing synthetic turf fields in San Francisco use the same infill material, styrene butadiene rubber (SBR) crumb and sand, that petitioners challenge in this case.

C.      *Administrative Proceedings*

The City's Planning Department issued a Notice of Preparation/Initial Study for the Beach Chalet project in February 2011, and released the draft EIR for the project on October 26, 2011. This 368-page draft EIR disclosed that the Beach Chalet project would have unavoidable significant impacts on historic resources, incorporated mitigation measures to reduce impacts on biological resources and exposure to hazardous materials, and examined in detail four potential alternatives to the project (including a "no project" alternative). Following the public comment period and a public hearing, the Planning Department prepared Comments and Responses for the draft EIR, also known as the final EIR, which addressed environmental issues raised by the public, contained additional analysis and reports, revised the text of the EIR in response to comments or based on additional information that became available during the public review period, and corrected errors in the EIR. The final EIR is over 1,750 pages.

On May 24, 2012, the Planning Commission adopted findings under CEQA including findings rejecting alternatives as infeasible, adopting mitigation measures, and adopting a statement of overriding considerations, and certified the final EIR.

On June 12, 2012, petitioners appealed the Planning Commission's certification of the final EIR to the Board of Supervisors. After a public hearing on July 10, 2012, the Board of Supervisors affirmed the Planning Commission's certification of the EIR.

---

Center in the Oceanview neighborhood, bringing the number of synthetic turf fields in San Francisco to 16.

D.    *Trial Court Proceedings*

On October 12, 2012, petitioners filed this action seeking a writ of mandate vacating the EIR and its certification and findings, and enjoining the project pending compliance with CEQA. The trial court granted the Foundation's motion to intervene.

Petitioners filed a first amended petition in February 2013, adding additional CEQA counts. Petitioner Sierra Club first appeared in this action with the first amended petition. Respondents filed a demurrer to the first amended petition which the trial court partially sustained without leave to amend, dismissing petitioners' claim that the City failed to exercise independent judgment in approving the project.

A bench trial was held on August 16 and 21, 2013. On December 3, 2013, the court issued its order on the merits, denying the petition for writ of mandate and dismissing the complaint in its entirety.

Petitioners timely appealed from the trial court's order on the merits and the judgment.

**DISCUSSION**

A.    *CEQA Principles and Standard of Review.*

For any proposed project that may have a significant effect on the environment, CEQA requires the lead agency to analyze the potential effects in an EIR. (§ 21151; Cal. Code Regs., tit. 14, § 15002, subd. (f) (Guidelines).) The EIR is "the public document used by the governmental agency to analyze the significant environmental effects of a proposed project, to identify alternatives, and to disclose possible ways to reduce or avoid the possible environmental damage." (Guidelines, § 15002, subd. (f).) Our Supreme Court has described the EIR as the " 'heart of CEQA.' " the purpose of which is "to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR 'protects not only the environment but also informed self-government.' (*Laurel Heights* [*Improvement Assn. v. Regents of University of California* (1988)] 47 Cal.3d [376,] 392 [(*Laurel Heights*)].)" (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 (*Goleta Valley*).) "The

5

foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citation.]" (*Laurel Heights*, *supra*, 47 Cal.3d at p. 390.)

"[A] court's inquiry in an action to set aside an agency's decision under CEQA 'shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' As a result of this standard, 'The court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' [Citation.]" (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392, fn. omitted.) "An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: the appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.]" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.)

" 'When the informational requirements of CEQA are not complied with, an agency has failed to proceed in "a manner required by law" and has therefore abused its discretion.' (*Save Our Peninsula Committee* [v. *Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99,] 118.) Furthermore, 'when an agency fails to proceed as required by CEQA, harmless error analysis is inapplicable. The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation. Case law is clear that, in such cases, the error is prejudicial.' (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 946.)" (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 723.) Phrased another way, "[w]hen the specific claim of legal error concerns an omission of required information from the EIR, the plaintiff must demonstrate that (1) the EIR did not contain information required by law and (2) the

6

omission precluded informed decisionmaking by the lead agency or informed participation by the public. [Citation.] These two elements constitute an abuse of discretion and prejudice, respectively, and together form reversible error. [Citations.]" (*Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 76-77, disapproved on other grounds by *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 457.)

"In applying the substantial evidence standard, 'the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision.' [Citation.] The Guidelines define 'substantial evidence' as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' (Guidelines, § 15384, subd. (a).)" (*Laurel Heights, supra,* 47 Cal.3d at p. 393.)

" 'In reviewing an agency's decision to certify an EIR, we presume the correctness of the decision. The project opponents thus bear the burden of proving that the EIR is legally inadequate.' [Citation.] However, '[w]hile we may not substitute our judgment for that of the decision makers, we must ensure strict compliance with the procedures and mandates of the statute.' [Citation.]" (*State Water Resources Control Bd. Cases*, *supra*, 136 Cal.App.4th at p. 723.)

B.      *The EIR's Evaluation of Human Health Risks Posed by SBR Infill*

In their First CEQA count, petitioners assert that the EIR failed to acknowledge the toxic chemical impacts of synthetic turf that uses SBR infill. Under CEQA, the EIR must include, among other things, a detailed statement setting forth "[a]ll significant effects on the environment of the proposed project," "[m]itigation measures proposed to minimize significant effects on the environment," and "[a]lternatives to the proposed project." (Pub. Resources Code, § 21100, subd. (b).) Petitioners contend the EIR was legally inadequate for failing to disclose that SBR infill poses significant risks to human health. It is undisputed that SBR infill contains a number of potentially toxic chemicals that pose both non-carcinogenic and carcinogenic health risks. Petitioners claim the City

7

failed to disclose that SBR infill exceeds the threshold of significance for non-cancer health risks. Petitioners also claim the EIR failed to rebut expert evidence that SBR infill creates significant cancer risks. We will summarize the analysis provided in the EIR and then address petitioners' arguments.

        1.     *Summary of the EIR Analysis*

The EIR explained that the proposed synthetic turf is composed of four components: fiber, infill, backing and underlayment. The fiber, composed of polyethylene, would be grass-like in appearance. The infill, used to provide stability, would be comprised of about 70 percent SBR and 30 percent sand. The fiber and infill would be supported by a backing of woven and unwoven polypropylene fabrics that provide strength and vertical drainage. Underlayment would consist of a drainage tile or an aggregate rock base.

The SBR used in the infill "is finely ground rubber derived from recycled scrap tires, and has been demonstrated to contain a number of volatile organic compounds (VOCs), semivolatile organic compounds (SVOCs) (including polynuclear aromatic hydrocarbons), and metals. VOCs in the SBR originate from the use of carbon black and petroleum oils in the tire production process." The predominant SVOCs identified are benzothiazoles, aniline, and phenols. The predominant metals include zinc, iron and manganese from the steel belts and beads used in the tires, barium, lead and chromium. "Today, the production of SBR material from tires typically includes a step to remove 99 percent of the steel belting and bead material, which should result in lower levels of iron, manganese, and chromium in the SBR material relative to earlier products. The SBR material also contains carbon black, an industrial chemical [composed of nanoparticles and] used in the manufacturing of automobile tires and other plastic materials."

The EIR also described the methodology used to determine whether exposure to the SBR material would pose a health risk. "A human health risk evaluation is used to assess whether exposure to chemicals would pose a health risk to humans. The evaluation includes several components, including data evaluation to characterize the

8

chemicals present and their concentrations; an exposure assessment to evaluate what receptors could be exposed to the chemicals and through which pathways (i.e., inhalation, ingestion, dermal contact); and a risk characterization. The risk characterization includes the assessment of noncarcinogenic (noncancer) and carcinogenic (cancer) risks to each potential receptor. [¶] The hazard quotient is used to evaluate potential noncancer health risks for each chemical. To address potential additive noncancer effects, the individual hazard quotient for each chemical and exposure route is summed to calculate a hazard index. A hazard index of less than or equal to 1 is indicative of acceptable levels of exposure for chemicals having an additive effect."

"Cancer health risks are defined in terms of the probability of an individual developing cancer as the result of exposure to a given chemical at a given concentration. To address potential additive effects, the estimated cancer risks for each chemical and exposure route are summed to estimate the total excess cancer risk for the exposed individual. The U.S. Environmental Protection Agency (USEPA) considers estimates of theoretical excess cancer risk of less than 1 in 1,000,000 [] to be *de minimis*, or acceptable. Risks within the range of 1 in 1,000,000 to 100 in 1,000,000 [] may also be acceptable depending on other risk management factors."

Having provided this background, the EIR discussed a number of research studies that assessed the potential risks of exposure to SBR material. The EIR examined a 2007 report published by the California Integrated Waste Management Board, prepared under contract by the state's Office of Environmental Health Hazard Assessment (OEHHA). This report, titled *Evaluation of Health Effects of Recycled Waste Tires in Playground and Track Products*, evaluated health risks to children using outdoor playground equipment and track surfaces constructed from recycled waste tires. Specifically, the report evaluated health risks associated with children's exposure to chemicals in the play surfaces via ingestion of loose tire shreds, ingestion as a result of hand-to-surface-to-mouth exposure, and skin sensitization as a result of dermal contact. The study examined the health risks to children through ingestion of tire shreds through both a review of

9

existing studies and a gastric digestion simulation. The study concluded that ingestion of 10 grams of loose tire shreds did not represent a serious non cancer risk and posed a de minimis cancer risk.

The EIR also considered the 2008 findings and recommendations of the Synthetic Playfields Task Force, which was established by the San Francisco Recreation and Parks Commission to address public concern over the potential health risks associated with the use of SBR infill. The task force was formed to review, discuss and vet existing scientific research on synthetic turf products. The task force made a number of recommendations, including that SFRPD avoid purchasing turf products containing lead; when feasible, select manufacturers whose infill products do not include zinc; and that further study be pursued to evaluate potential hazards such as off-gassing and particulate emissions.

Other studies examined included a 2009 OEHHA report which assessed the chemicals present in the air above indoor synthetic turf fields. This report examined existing studies and, using the data from those studies, found that five of the eight chemicals found in the air above the synthetic turf were associated with an increased cancer risk above a de minimis level. The report discussed a number of shortcomings in the prior studies, but stated that "further studies of the chemicals present above synthetic turf fields is warranted." A 2010 study by the California Department of Resources Recycling and Recovery conducted air sampling above existing synthetic turf fields and found that exposures to identified VOCs were below noncancer, health-based screening levels. A 2009 study by the New York Department of Health found noncancer risks from VOCs and SVOCs were "below hazard quotients for all chemicals." While potential cancer risks exceeded the de minimis standard, this result could not be attributed to emissions from the synthetic turf as the on-field samples were similar to those of the upwind, background samples. A 2010 study by five Connecticut state agencies examined air sampling data and found associated cancer risks were only slightly above a de minimis standard and chronic noncancer risks were not elevated above a hazard index of

1. The air sampling data included results from an indoor facility, which produced the highest exposure in the data. Finally, a 2008 evaluation conducted on behalf of the Bainbridge Island Metro Parks and Recreation District in Washington examined available scientific literature and conducted a risk assessment based on that data and concluded that cancer risks did not exceed the de minimis level and that the combined noncancer hazard index was far below the threshold of 1.

The final step of the risk evaluation is determining whether a particular environmental impact, here, the hazards associated with the use of SBR infill on the athletic fields, is *significant* within the meaning of CEQA. The EIR discussed the studies, summarized above, relevant to each route of exposure and concluded, for each, that the health impacts related to the SBR infill would be less than significant. The Comments and Responses document contained comments submitted by the public, which included hazardous materials studies not included in the draft EIR and alternate interpretations of the studies that were included in the draft EIR. The City considered the comments and studies and concluded that they would not result in changes to the significance determinations identified in the draft EIR.

2. *Noncarcinogenic Toxicity*

Petitioners argue that the City abused its discretion in failing to identify the non-cancer risks of SBR infill as significant. The petitioners' challenge is legal, not factual. Specifically, petitioners contend that the City failed to proceed in a manner required by law by ignoring thresholds of significance adopted by the Bay Area Air Quality Management District (BAAQMD).[3] According to petitioners, under the BAAQMD standards, there is "no dispute" that the noncancer toxicity of SBR infill is "more than double the CEQA significance threshold," but "the EIR failed to disclose, analyze and

_____

[3] The EIR explains that the BAAQMD "is the primary agency responsible for air quality regulation in the nine county San Francisco Bay Area Basin (SFBAAB). As part of their role in air quality regulation, BAAQMD has prepared the CEQA air quality guidelines to assist lead agencies in evaluating air quality impacts of projects and plans proposed in the SFBAAB."

11

mitigate this significant impact." The City responds that the BAAQMD threshold of significance upon which petitioners rely is not relevant to an analysis of the health risks of SBR infill. It further argues that the fact that a single study found that ingestion of SBR infill could lead to an acute hazard index (AHI) in excess of 1.0 did not compel a finding that SBR infill creates a significant risk to human health.

In support of their argument that SBR infill creates a significant non-cancer risk to human health, petitioners rely on the following statement in the EIR which describes the results of a test simulating the effect of a child consuming 10 grams of tire shreds: "When tested using a gastric simulation, which is considered more representative of actual conditions, the hazard index was 2.2 sufficiently close to a hazard index of 1, and deemed not to represent a serious health hazard by the 2007 OEHHA study." Based on this statement, petitioners contend that the noncancer risk of SBR infill is "more than double" the threshold of significance adopted by BAAQMD and, therefore, significant under CEQA.

Petitioners argument is premised on the following: In 2010, BAAQMD adopted "thresholds of significance" for determining whether a project's "emissions would be cumulatively considerable, resulting in significant adverse air quality impacts to the region's existing air quality conditions." Relevant to this appeal, these BAAQMD thresholds of significance included the following threshold for "Risk and Hazards for new sources and receptors": "Increased non cancer risk of > 1.0 Hazard Index (Chronic or Acute)."[4] Petitioners' argument fails, however, because the City did not, and was not required to, adopt or apply this BAAQMD threshold of significance in the EIR.

---

[4] The BAAQMD Guidelines further describe this threshold of significance by stating: "If emissions of [toxic air contaminants] or fine particulate matter . . . exceed any of the *Thresholds of Significance* listed below, the proposed project would result in a significant impact. [¶] . . . [¶] An excess cancer risk of more than 10 in one million, or a non-cancer (i.e., chronic or acute) hazard index greater than 1.0 would be a cumulatively considerable contribution." The Guidelines define "Toxic Air Contaminants" as "[a]ir pollutants which cause illness or death in relatively small quantities. Non-criteria air contaminants that, upon exposure, ingestion, inhalation, or assimilation into organisms

12

CEQA requires that an EIR include, among other things, a "detailed statement setting forth '[a]ll significant effects on the environment of the proposed project' and '[m]itigation measures proposed to minimize significant effects on the environment.' [Citations.] 'For each significant effect, the EIR must identify specific mitigation measures; where several potential mitigation measures are available, each should be discussed separately, and the reasons for choosing one over the others should be stated.' " (*Lotus v. Department of Transportation* (2014) 223 Cal.App.4th 645, 653 (*Lotus*), quoting first Pub. Resources Code § 21100, subd. (b), and then *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1027.) "The determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data. An ironclad definition of significant effect is not always possible because the significance of an activity may vary with the setting." (Guidelines, § 15064, subd. (b).) As a result, "a lead agency has the discretion to determine whether to classify an impact described in an EIR as 'significant,' depending on the nature of the area affected. " (*North Coast Rivers Alliance v. Marin Municipal Water District Board of Directors* (2013) 216 Cal.App.4th 614, 624.)

The CEQA Guidelines state that "[e]ach public agency is encouraged to develop and publish thresholds of significance that the agency uses in the determination of the significance of environmental effects." (Guidelines, § 15064.7, subd. (a).) A "threshold of significance is an identifiable, quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant[.]" (Guidelines, § 15064.7, subd. (a).) Thresholds of significance that are to be applied for " 'general use' – that is, for use in evaluating significance in all future projects" must be formally adopted by ordinance,

---

either directly from the environment or indirectly by ingestion through food chains, may cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions, or physical deformations in such organisms or their offspring."

resolution, rule, or regulation following a public review process. (*Save Cuyama Valley v. County of Santa Barbara* (2013) 213 Cal.App.4th 1059, 1068 (*Cuyama Valley*); see also Guidelines, § 15064.7, subd. (b).) The Guidelines do not "*require* a public agency to adopt such significance thresholds, however, and [do] not forbid an agency to rely on standards developed for a particular project." (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 896 (*Oakland Heritage*).)

Here, it is undisputed that the City has not formally adopted thresholds of significance for general use relevant to this appeal. Petitioners argue, however, that because the City had not adopted a general threshold of significance, it was required to apply the BAAQMD's thresholds of significance: "[W]hen an agency has not adopted its own CEQA significance thresholds, it must apply CEQA thresholds adopted by another authoritative agency." We are unpersuaded. As just discussed, the City was free to adopt a project-specific significance standard and was not required to adopt formally a threshold of significance. (*Oakland Heritage*, *supra*, 195 Cal.App.4th at p. 896 [CEQA "does not forbid an agency to rely on standards developed for a particular project"].) This is precisely what the City did in the EIR.

The EIR adopts a standard of significance relating to the use of hazardous materials for the project and their effect on human health. Specifically, the EIR provides: "The [City] has not formally adopted significance standards for impacts related to hazards and hazardous materials, but generally considers that implementation of the proposed project would have a significant impact if it were to: [¶] . . . Create a significant hazard to the public or the environment through the routine transport, use, or disposal of hazardous materials; or [¶] . . . Create a significant hazard to the public or the environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment." The EIR goes on to explain that "[i]mpacts related to the routine use of the synthetic turf would be significant if the use resulted in adverse health effects due to inhalation of vapors and particulates from the

14

synthetic turf, ingestion of the synthetic turf, dermal contact with the synthetic turf materials, or inappropriate use of detergents and disinfectants to maintain the field."

The language of this significance standard is derived from Appendix G of the CEQA Guidelines. "Appendix G of the CEQA Guidelines is an 'Environmental Checklist Form' that may be used in determining whether a project could have a significant effect on the environment and whether it is necessary to prepare a negative declaration or an EIR." (*Oakland Heritage*, *supra*, 195 Cal.App.4th at p. 896, fn. 5.) Under the section entitled "VII. Hazards and Hazardous Materials," the checklist recommends that an agency ask whether a project would "[c]reate a significant hazard to the public or the environment through the routine transport, use, or disposal of hazardous materials?" (Guidelines, Appendix G.)

A leading CEQA treatise has noted that "[a]lthough Appendix G is designed to function as an initial study checklist for determining whether an EIR is required, many lead agencies use the standards in Appendix G as a basis for defining standards of significance in an EIR." (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (2d ed. 2008) § 13.15, at p. 13-16 (Kostka & Zischke).) Courts have recognized the utility of Appendix G in determining significance standards. For example, in *Oakland Heritage*, the court held that an EIR had adequately evaluated the risk of seismic damage to structures as a potential adverse impact of a project: "[E]ven if the City were required to use the CEQA Guidelines' significance criteria, the threshold of significance used for the project was effectively coextensive with the CEQA Guidelines. The Revised EIR specifies that a project would have a significant seismic effect if it would expose people or structures to 'substantial risk of loss, injury, or death,' which is, in substance, the language of Appendix G[.]" (*Oakland Heritage*, *supra*, 195 Cal.App.4th at pp. 896-897.) Similarly, in *Cuyama Valley*, the court, in reviewing an EIR, stated: "[T]he County was not required to explain why it did not use Appendix G's thresholds of significance. Those thresholds are 'only' a 'suggest[ion].' " (*Cuyama Valley*, *supra*, 213 Cal.App.4th at p. 1068.)

15

In light of the above, petitioners' contention that the "City has not adopted its own CEQA significance thresholds" is incorrect. While, as discussed, the City has not adopted formal "thresholds of significance" generally applicable to all projects in the City, it did adopt a significance standard for this project based on Appendix G. Further, petitioners have not provided any authority stating that the City was *required* to adopt the thresholds of significance recommended by the BAAQMD. The case upon which petitioners rely, *Lotus*, does not stand for that proposition. In *Lotus*, the court held that an EIR prepared by Caltrans did not comply with CEQA because it failed to evaluate the significance of a project's impact on the root systems of old growth redwood trees adjacent to a planned roadway. (*Lotus*, *supra*, 223 Cal.App.4th at p. 653.) The court noted that the EIR disclosed that the project activity would "take place within the root zones of specific old growth redwood trees" and would also result in changes to the "impermeable area covering the root zones of some of the old growth redwood trees." (*Id.* at p. 654.) The EIR did not, however, "include any information that enables the reader to evaluate the significance of these impacts." (*Ibid.*) The appellants in that case argued that the proper measure of significance was found in a publication by another agency, namely the State Parks Natural Resources Handbook. (*Ibid.*) This handbook contained various standards for determining the probability that a given tree would be damaged by construction on or around its root system. (*Ibid.*) Caltrans "implicitly acknowledge[d] the value of the handbook" by referring to its standards in its appellate brief. (*Ibid.*) Nonetheless, the "EIR itself . . . [did] not reference the handbook or apply the standards it prescribes to evaluate impacts to the old growth redwoods that may be expected to result from the highway construction." (*Id.* at p. 655.)

The error by Caltrans in *Lotus*, however, was not its failure to apply the significance standards in the State Parks' Handbook in the EIR. Rather, the agency erred by failing to adopt *any* standard for determining whether the planned project would have significant effects on old growth redwood trees: "[T]he EIR fails to identify any standard of significance, much less to apply one to an analysis of predictable impacts from the

16

project." (*Lotus*, *supra*, 223 Cal.App.4th at p. 655.)  While the court discussed the State Park Natural Resources Handbook standards at length because the parties were in apparent agreement that they were relevant, the court did not hold that Caltrans had been *required* to apply those standards.  Rather, the court stated: "We do not suggest that the handbook is the only or necessarily the best measure for determining significance.  The standard of significance applicable in any instance is a matter of discretion exercised by the public agency 'depending on the nature of the area affected.' " (*Id.* at p. 655, fn. 7.)  In contrast to Caltrans in *Lotus*, here the City exercised its discretion to adopt a significance standard based on Appendix G of the Guidelines.  Accordingly, *Lotus* does not advance petitioners' position.

Petitioners argue that the City's contention that the BAAQMD threshold of significance does not apply "ignores the basic purpose of CEQA thresholds – which is to promote consistency."  Petitioners cite *Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, for the proposition that a " ' "lead agency's use of existing environmental standards in determining the significance of a project's environmental impacts is an effective means of promoting consistency in significance determinations and integrating CEQA environmental review activities with other environmental program planning and regulation." ' " (*Id.* at p. 1107, quoting *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 111.)  While such consistency may be beneficial – and is likely why the CEQA Guidelines "encourage[]" agencies to develop and publish generally applicable thresholds of significance  (Guidelines, § 15064.7, subd. (a)) – a lead agency is not required to adopt the significance standards adopted by another agency.  In fact, a leading CEQA treatise, citing the BAAQMD thresholds of significance, states:  "[A] number of air quality management districts have adopted guidelines for assessing air quality impacts that included suggested quantitative standards for measuring the significance of emissions.  [Citations.]  Lead agencies are not required to use the significance standards

17

suggested in regulatory agency guidance documents." (Kostka & Zischke, *supra*, § 13.14, at p. 13-15.)

In support of their argument that the City's position undermines CEQA's goal of promoting consistency, petitioners cite a 2010 EIR developed by the City of Piedmont that found that the potential hazardous effects from synthetic turf would be considered a significant impact. Petitioners contend that "[i]f SBR is toxic in Piedmont, then it is also toxic in San Francisco." While petitioners quote the ultimate conclusion by the EIR on this point, they leave out the introductory phrase to this conclusion: "*Therefore, as a 'conservative' finding*, the potential hazardous effects from the use of the proposed synthetic turf field at Blair Park and Coaches Field [in Piedmont] would be considered a significant impact." (Emphasis added.)[5] The Piedmont EIR had found that "the current body of data . . . concludes synthetic field to have little effect on health or pose risks to humans," but the City of Piedmont arrived at its "conservative" conclusion given the "lack of final consensus among part of the scientific community." That the City of Piedmont reached a different conclusion from the City in this matter does not compel a finding that the City's conclusion constituted an abuse of discretion.[6] (*Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1330 ["While City could have reached a different conclusion than it did based upon the evidence that is not our concern."].)

---

[5] The relevant portion of the Piedmont EIR is contained in the administrative record.

[6] The City of Piedmont EIR employed the same significance standard regarding use of hazardous materials as the City did in the matter before us: "The proposed project would result in a significant impact related to public health and safety if it would have any of the following effects: [¶] . . . Create a significant hazard to the public or the environment through the routine transport, use, or disposal of hazardous materials; [¶] . . . Create a significant hazard to the public or the environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment[.]" We note that nowhere in its discussion of the health hazards posed by synthetic turf does the City of Piedmont EIR cite or discuss the BAAQMD's thresholds of significance.

18

Petitioners next argue, apparently in the alternative, that the EIR actually relies upon BAAQMD's significance threshold. The City acknowledges that the EIR references the BAAQMD's standards, but states that this discussion is "related to the generation of greenhouse gases." The City is correct. The BAAQMD's Air Quality Guidelines provide a number of different thresholds of significance for different forms of air pollution. In addition to the "risk and hazard" threshold upon which petitioners rely and that is discussed above, BAAQMD provides a threshold of significance for greenhouse gas emissions. The only reference to a BAAQMD threshold of significance in the EIR is contained in the project's initial study, attached as Appendix A to the EIR.[7] The referenced significance of threshold addresses greenhouse gas emissions – not exposure to hazardous materials. This threshold provides that a project's greenhouse gas emissions are not significant if the project is in "Compliance with Qualified [Greenhouse Gas] Reduction Strategy." The initial study found that the project would have less than significant impacts regarding greenhouse gas emissions.[8] Petitioners have cited no authority that the City, having chosen in its discretion to adopt BAAQMD's greenhouse gas emission threshold standard, was therefore required to adopt *all* of the BAAQMD's recommended thresholds of significance.

Petitioners next contend that the EIR itself adopts an AHI of 1.0 as the threshold of significance for determining whether a non-cancer health risk is significant. Thus, because the EIR cites the 2007 OEHHA study finding an AHI of 2.2, petitioners contend the City erred in failing to identify the health risks as significant. The EIR, however,

---

[7] Under CEQA, an initial study is a "preliminary analysis prepared by the lead agency to determine whether an EIR or a negative declaration must be prepared or to identify the significant environmental effects to be analyzed in an EIR." (Guidelines, § 15365.)

[8] Among the reasons for this conclusion was the fact that "San Francisco's Strategies to Address Greenhouse Gas Emissions meet BAAQMD's requirements for a Qualified GHG Reduction Strategy, [and thus] projects that are consistent with San Francisco's regulations would not contribute significantly to global climate change. The proposed project would be required to comply with these requirements."

simply states that "[a] hazard index of less than or equal to 1 is indicative of acceptable levels of exposure for chemicals having an additive effect." Further, in summarizing the results of the 2007 OEHHA study involving ingestion of tire shreds, the EIR states: "When tested using a gastric simulation, which is considered more representative of actual conditions, the hazard index was 2.2, sufficiently close to a hazard index of 1, and deemed not to represent a serious health hazard by the 2007 OEHHA study." The EIR's statement that an AHI of less than or equal to 1.0 is "indicative" of acceptable levels of exposure does not, however, establish a significance standard. Rather, as discussed above, the significance standard the City adopted in the EIR asks if the use of SBR infill would result in "adverse health effects" as a result of inhalation of vapors from the turf, ingestion of the turf, or dermal contact with the turf materials. The statements cited by petitioners suggest that the City used a concept of AHI to inform its determination of whether SBR infill would have adverse health effects. However, the fact that a single study found an AHI greater than 1.0 (but nonetheless found no serious health hazard) [9] did not compel the City to conclude that SBR infill posed a significant health risk under the significance standard the City had adopted.

---

[9] The EIR discussion of the 2007 OEHHA study makes clear that the study found the 2.2 AHI was "close to 1," thus suggesting that the "complex mixture of chemicals [in tire shreds] does not represent a serious health hazard." As discussed by the City at oral argument, the 2007 OEHHA study contained a number of conservative assumptions that underlie the study's conclusions that the synthetic turf did not pose serious health risks, notwithstanding the 2.2 AHI. First, the study noted that the AHI approach "is most meaningful when applied to chemicals that cause similar effects on the same target organ. Such is not the case here." Second, "[c]hemicals released [during the gastric simulation] were assumed to be 100 percent bioavailable." Third, the study "assumed that a 15 kg child might acutely ingest 10 grams of shredded rubber at one time, similar to the upper limit of soil ingestion recommended for estimating acute exposures in children. This kind of soil ingestion is not a typical behavior pattern observed in most children, but rather a poorly characterized behavior seen in a subset of young children." Such assumptions may explain the 2007 OEHHA study's conclusion that there was no serious health risk, notwithstanding the AHI in excess of 1.0.

20

In sum, the City did not fail to adopt a significance standard for the risks posed by SBR infill or ignore any legally binding threshold of significance. Accordingly, petitioners have not shown that the City failed to proceed in a manner required by law. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392.)[10]

3.    *Carcinogenic Toxicity*

Petitioners next challenge the EIR's conclusion that the cancer risks posed by SBR infill are less than significant. It is undisputed that the draft EIR discussed numerous studies that examined the cancer risks posed by SBR infill. These studies generally found that synthetic turf using recycled rubber presented either a de minimis or an acceptably low risk of cancer. Petitioners argue, however, that they presented studies and expert reports, postdating those discussed in the EIR, that establish that the carbon black, dioxins, and polycyclic aromatic hydrocarbons (PAHs) contained in the SBR infill present a significant risk of cancer. Petitioners contend that the EIR fails to present substantial evidence to rebut these later studies. The City responds that the EIR addresses the presence of these substances in SBR infill and discusses studies evaluating the risks they pose. It contends that substantial evidence supports the EIR's ultimate conclusion that SBR infill does not present a significant cancer risk.

In arguing that the EIR failed to produce substantial evidence to rebut the studies petitioners presented to the City, petitioners rely solely on the case of *Berkeley Keep Jets Over Bay v. Board of Port Commissioners* (2001) 91 Cal.App.4th 1344 (*Berkeley Jets*). We begin our analysis by describing our holding in that case. There, we held that an EIR created by the Board of Port Commissioners for the Port of Oakland was inadequate. This conclusion was based on the fact that the EIR failed to utilize the best available data

---

[10] On December 30, 2014, we granted the application of the Golden Gate Audubon Society, Public Employees for Environmental Responsibility, San Francisco Tomorrow, California Safe Schools, and Jean Barish's application for leave to file an amicus curiae brief. In this brief, amici argue that that "the EIR should have found that this SBR infill poses a significant environmental impact" because the "AHI is twice the CEQA threshold. For the reasons discussed above, we find this argument unpersuasive.

to assess the increased emissions of toxic air contaminants from airplanes that would result from a proposed airport expansion.  (*Id.* at p. 1364.)  The EIR used a 1991 speciation profile[11] published by the California Air Resources Board (ARB) to estimate jet aircraft emissions.  During the comment period, an air quality expert criticized the use of the 1991 speciation profile as outdated because the ARB had drafted a new speciation profile which included a wider range of air contaminants.  (*Id.* at p. 1365.)  The final EIR responded to this comment by citing a conversation between a port representative and an air pollution specialist from ARB.  The final EIR response claimed that this specialist had " 'expressed concern regarding the accuracy of some of the particular compounds' " specified in the new speciation profile and that the ARB had "not determined what speciation profile will be included for jet exhaust when it releases its third edition of the reference manual."  (*Id.* at p. 1365.)  This response turned out to be false.  In a subsequent declaration filed in connection with CEQA litigation, the air pollution specialist stated he had told the port representative that the new speciation profile " 'is the best profile available. . . .  I did not say that I doubted the overall accuracy of the [new speciation profile].  I did say that the [old profile] should not be used to characterize jet exhaust speciation.' "  (*Id.* at p.1366, italics omitted.)

We held that the EIR's response to the comments regarding the Port's use of the old speciation profile failed to comply with CEQA's requirement that an EIR make "a good faith effort at full disclosure."  (Guidelines, § 15151.)  " ' "Where comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and  its alternatives, these comments may not simply be ignored.  There must be good faith, reasoned analysis in response." ' "  (*Berkeley Jets, supra,* 91 Cal.App.4th at p. 1367, quoting *Cleary v. County of Stanislaus* (1981) 118 Cal.App.3d 348, 357.)  We found the EIR deficient in this regard because the "Port created the misleading impression that [an

---

[11] A "speciation profile" is a document that provides estimates of the chemical composition of emissions.  (*Berkeley Jets, supra,* 91 Cal.App.4th at p. 1364.)

ARB] official had discouraged the Port from utilizing" the new speciation profile and failed to disclose the official's opinion that the older profile "should not be used to characterize jet exhaust speciation." (*Berkeley Jets, supra,* 91 Cal.App.4th at p. 1366.) This omission was serious because it "prevent[ed] a decisionmaker and the public from gaining a true understanding of one of the most important environmental consequences of increasing the number of flights." (*Id.* at pp. 1366-1367.) In addition, we held that "[b]y using scientifically outdated information" derived from the old profile, the "EIR was not a reasoned and good faith effort to inform decisionmakers and the public about the increase in . . . emissions that will occur." (*Ibid.*)

Accordingly, in reviewing petitioners' argument here that the City failed to rebut petitioners' expert evidence regarding the cancer risk posed by carbon black, PAHs, and dioxins, we look to determine whether the EIR discussion of these chemicals reflects a good faith effort to inform decisionmakers and the public on this issue. "CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive." (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1046.) "[A]n EIR must be upheld if it 'reasonably sets forth sufficient information to foster informed public participation and to enable the decision makers to consider the environmental factors necessary to make a reasoned decision.' " (*Ibid.*, quoting *Berkeley Jets, supra,* 91 Cal.App.4th at p. 1356.) We examine the EIR's response the studies Petitioners have cited regarding carbon black, dioxins, and PAHs in light of this standard.

Petitioners first assert that the public provided the City with extensive evidence of the cancer risk posed by carbon black. They cite the fact that the OEHHA lists carbon black as a carcinogen and that it comprises approximately 20 percent of the content of SBR. However, the public comments cited by petitioners merely describe the carcinogenic properties of carbon black. The EIR disclosed the presence of carbon black in SBR infill and acknowledged that laboratory research "indicates that there can be health risks associated with the inhalation of these particles." In addition, the final EIR

23

included multiple examples of public comments addressing the fact that SBR infill includes carbon black and that carbon black is a known carcinogen. The EIR addressed these comments and the studies they referenced by noting that they "describe laboratory research or evaluate risks in the workplace environment which would be enclosed, and would result in more intense exposure to nanoparticles. Because of this, and because wind would disperse the nanoparticles, if generated, it is expected that exposures to nanoparticles as a result of play on synthetic turf fields that use SBR infill would be minimal, if any at all[.]"

Petitioners contend that this response is inadequate because the EIR's "wind dispersion hypothesis" is a "conclusory analysis without any citation to scientific evidence." The EIR, however, discussed studies which found that play on synthetic turf fields resulted in negligible generation of nanoparticles. Further, three separate studies discussed in the EIR noted how air samples taken from above indoor synthetic turf fields contained higher concentrations of potentially hazardous chemicals when compared to outdoor fields. These studies provide support for the City's conclusion that carbon black did not present a significant cancer risk when present in outdoor synthetic fields using SBR infill.

Regarding the cancer risk posed by dioxins, the City in its brief acknowledges that the EIR does not address this risk, but maintains "no study, including the one petitioners cite, suggests any dioxin risk associated with SBR turf." The City is correct that petitioners have failed to cite a study discussing the cancer risk posed by dioxins in SBR infill. Petitioners rely on an abstract from a 2011 study entitled "Artificial-turf playing fields: contents of metals, PAHs, PCBs, PCDDs and PCDFs, inhalation exposure to PAHs and related preliminary risk assessment" (2011 Abstract). The 2011 Abstract states that artificial-turf granulates contain polychlorinated diobenzo dioxins (PCDD). Petitioners imply that this study concluded that the presence of PCDDs created a cancer risk by quoting the abstract as follows: "The sums of NDL-PCBs and WRO-TE *PCDDs*+PCDFs were, respectively, 0.18 and 0.67 x 10(-5) mglkg . . . Based on the 0.4

24

ng/m(3) concentration, *an excess lifetime cancer risk of 1 x 10(-6) was calculated for an intense 30-year activity.*"  (Emphases added in appellants brief.)

Petitioner's reliance on this statement from the 2011 Abstract does not support a finding that dioxins pose a significant cancer risk for two reasons.  First, the United States Environmental Protection Agency deems an excess lifetime cancer risk of less than $1 \times 10^6$ to be de minimis – a fact recognized by petitioners in their briefing.  Accordingly, the 2011 Abstract reports a cancer risk that is at the threshold of being de minimis.  Second, in quoting the 2011 Abstract, petitioners have omitted a key portion of the quotation, thereby disguising the fact that the abstract was not discussing the cancer risk posed by dioxins at all.  This abstract states that dioxins are present in rubber granulates used in synthetic turf.  It says nothing about the cancer risk associated with dioxins.  The only reference to a cancer risk in the abstract pertains to benzo(a)pyrene (BaP), which is a polycyclic aromatic hydrocarbon (PAH), not a dioxin.[12]  The final EIR addresses this study on which the abstract is based and correctly notes that its cancer findings related to BaP, not dioxins: "PAH concentrations in air samples from one synthetic turf field exceeded background concentrations.  Using conservative assumptions, the excess cancer risk level associated with inhalation of benzo(a)pyrine (the PAH modeled for the risk analysis) was approximately one in a million."  Finally, petitioners' own purported expert, Matthew Hagemann, described the finding of the 2011 study as "show[ing a] risk to be in excess of $10^6$ from particle-bound *polycyclic aromatic hydrocarbons*." (Emphasis added.)  As petitioners' counsel acknowledged at oral argument, PAHs are not dioxins.  Accordingly, petitioners have failed to demonstrate that the City was provided with any comments relating to the cancer risks posed by dioxins.

---

[12] The full quote from the 2011 Abstract reads: "The sums of NDL-PCBs and WRO-TE PCDDs+PCDFs were, respectively, 0.18 and 0.67 x 10(-5) mg/kg.  The increased BaP concentrations in air, due to the use of the field, varied approximately from <0.01 to 0.4 ng/m(3), the latter referring to worst-case conditions as to the release of particle-bound PARs.  Based on the 0.4 ng/m(3) concentration, an excess lifetime cancer risk of 1 x 10(-6) was calculated for an intense 30-year activity."

Petitioners next contend that the EIR failed to adequately address comments related to the cancer risk posed by PAHs. Again, the City maintains that the EIR addressed these chemicals and evaluated the risks they posed. In their brief, petitioners cite a 2012 study from the scientific journal *Chemosphere* which found high levels of PAHs in recycled rubber tire playgrounds and rubber pavers (i.e., rubber tiles). This study recognized that PAHs are considered carcinogens and concluded: "The present study highlights the presence of a high number of harmful compounds, frequently at high or extremely high levels, in these recycled rubber materials. Therefore, they should be carefully controlled, and their final use should be restricted or even prohibited in some cases." This study did not examine use of rubber in synthetic turf or provide an estimate of the excess lifetime cancer risk posed by synthetic turf. Rather, it discussed the fact that high levels of PAHs were found in recycled rubber materials. Petitioners argue that the studies upon which the City relies all pre-date this study and therefore cannot "possibly rebut" it.

However, the EIR and the studies upon which it relied disclosed the presence of PAHs in SBR infill as well as their carcinogenic properties. First, in examining the risks posed by ingestion of SBR through surface-to-hand-to-mouth contact, the 2007 OEHHA study identified a single PAH was present above the screening level, and disclosed that the theoretical increased cancer risk posed by this PAH was 2.9 in a million. The study concluded that "[t]his risk is slightly higher than the benchmark of $1 \times 10^6$, generally considered an acceptable cancer risk due to its small magnitude compared to the overall cancer rate." This specific PAH finding was discussed in the EIR.

Second, the 2009 OEHHA study calculated the increased lifetime cancer risk posed by inhalation of air above indoor synthetic fields. The study found that of eight carcinogenic chemicals observed in air samples taken from above the indoor fields, five (including the PAHs benzene and naphthalene) were above the "negligible risk level of $10^6$." Specifically, these two PAHs were found to present an excess lifetime cancer risk of $2.8 \times 10^6$ and $3.8 \times 10^6$, respectively. The ultimate conclusion of the study, however,

26

was not that synthetic turf posed a significant cancer risk, but rather: "Data from indoor fields were used to estimate outdoor exposures and calculate these cancer risks. In addition, it was assumed that all organized soccer play over a lifetime occurred on artificial turf fields. Together, these assumptions tend to overestimate the cancer risks for soccer players using artificial turf fields." This PAH finding was also disclosed in the EIR.

Third, the Bainbridge, Washington study also discussed the presence of PAH in recycled rubber turf. The study devised a "play scenario" that formulated the cancer risk a teenager would face if he or she were to play on synthetic turf for three hours a day, 261 days per year, for seven years. The study concluded that this teenager would be exposed to a lifetime excess cancer risk of $1 \times 10^6$ as a result of exposure from PAHs from all routes of exposure. While this was "at the risk threshold," the study noted that its analysis was based on concentrations of chemicals found in indoor facilities rather than open air environments. This was significant because "[u]sing the indoor air value overestimates the likely risks associated with inhalation of VOCs in outdoor environments."

As these studies demonstrate, the presence of PAHs and the fact that they present a cancer risk are disclosed in the EIR. Petitioners' 2012 study does not undermine these studies or shed additional light on the carcinogenic risk posed by PAHs. Rather, it simply reinforces the conclusion that PAHs are carcinogenic and are found in recycled rubber materials. These facts are already disclosed in the EIR.

Finally, petitioners rely on two letters in the administrative record that were written in response to the draft EIR and addressed the cancer risks of SBR infill in general. One letter was written by Matthew Hagemann, a professional geologist and certified hydrogeologist who served as a senior science policy advisor for the Environmental Protection Agency, and one by Philip Landrigan, a medical doctor. Petitioners argue that the studies cited in the EIR fail to rebut these materials. However, neither letter " ' "disclose[s] new or conflicting data or opinions that cause concern that

27

the agency may not have fully evaluated the project." ' " (*Berkeley Jets*, *supra*, 91 Cal.App.4th at 1367.)

Hagemann's letter addressed the 2009 OEHHA study discussed above. According to his letter, summing the cancer risks presented from the eight carcinogenic chemicals identified in the air above indoor synthetic fields resulted in a total cancer risk of 19 in 1 million – which is greater than the 1 in 1 million standard. However, as we discussed above, the 2009 OEHHA study was addressed in the EIR, and both the EIR and the study itself acknowledged that the study overstated the cancer risks due to its reliance on air sampling data taken from above indoor synthetic fields. Additionally, the Planning Department, in recommending that the Board uphold the certification of the final EIR, addressed the substance of Hagemann's analysis,[13] by pointing out that petitioners argued "incorrectly that the cancer risks presented for 5 chemicals identified in the 2009 OEHHA study, and disclosed in the EIR, are 'cumulative' (i.e., additive). However, this calculation method is not correct, not representative of the results of the 2009 report, and does not accurately represent cancer risks."

Similarly, Landrigan's letter, cited by petitioners, stated that crumb rubber contains dangerous chemicals, including known carcinogens. He concluded that "this remains an area of potential risk that has not been studied to our satisfaction." As we discussed above, the presence of known carcinogens in SBR infill was disclosed in the EIR. The EIR ultimately concluded, after reviewing a number of studies, that the cancer risk posed by these chemicals was not significant. The fact that two individuals disagree with the EIR's conclusions regarding the cited studies does not render the EIR's evaluation of SBR infill's cancer risks inadequate. (See *Oakland Heritage*, *supra*, 195

---

[13] Although the recommendation did not cite Hagemann by name, it appears that it was addressing the substance of his comment, namely the additive nature of the cancer risks posed by the components of SBR infill.

Cal.App.4th at p. 769 [" '[A] public agency may choose between differing expert opinions.' "].)[14]

As we have noted, the studies and letters upon which the petitioners rely either failed in fact to actually address increased cancer risks (in the case of dioxins) or were cumulative of information already contained in the EIR (carbon black and PAHs). Petitioners have not shown that the City was presented with " ' " 'new or conflicting data or opinions that cause concern that the [City] may not have fully evaluated' " ' " the cancer risks posed by SBR infill or its constituent chemicals   (*Berkeley Jets*, *supra*, 91 Cal.App.4th at p. 1367.)  Rather, the EIR included sufficient information to permit informed decisionmaking and public participation relating to the cancer risks of SBR infill in general and carbon black and PAHs in particular.  (*Id.* at p. 1355.)  This is what CEQA requires.[15]

4.      *Amici's Precautionary Principle Argument*

In their amicus brief, amici contend that the EIR failed to provide a "forthright discussion" of the City's "Precautionary Principle" and therefore precluded informed decisionmaking and informed public participation.

Section 101 of San Francisco's Environmental Code provides, in relevant part: "Based on the best available science, the Precautionary Principle requires the selection of the alternative that presents the least potential threat to human health and the City's natural systems.  Public participation and an open and transparent decision making process are critical to finding and selecting alternatives.  Where threats of serious or irreversible damage to people or nature exist, lack of full scientific certainty about cause and effect shall not be viewed as sufficient reason for the City to postpone cost effective

---

[14] For the reasons stated above, we reject amici's argument that the EIR failed to address inadequacies in the studies contained in the EIR or respond to the materials provided by the petitioners.

[15] On January 27, 2015, petitioners' filed a Request for Judicial Notice asking us to take notice of Senate Bill 47, introduced on December 17, 2014.  The request is denied.

measures to prevent the degradation of the environment or protect the health of its citizens. Any gaps in scientific data uncovered by the examination of alternatives will provide a guidepost for future research, but will not prevent the City from taking protective action. As new scientific data become available, the City will review its decisions and make adjustments when warranted. Where there are reasonable grounds for concern, the precautionary approach to decision-making is meant to help reduce harm by triggering a process to select the least potential threat."

The final EIR acknowledged the "Precautionary Principle," and stated that the "project is consistent with this ordinance because there is no evidence that adverse human health effects would occur as a result of play on the athletic fields[.]"

Amici argue that the final EIR's treatment of the Precautionary Principle conflated CEQA's "standard of no significant impact" with the standard of "no risk" to human health. They thus contend that the EIR failed to present any "unbiased analysis of the application of the Precautionary Principle to the project, and is inconsistent with the City's codification of risk aversion when spending the City's money." As the City points out in its brief, however, the City's Precautionary Principle does not impact the substantive requirements governing an EIR or a lead agency's decisionmaking under CEQA. In fact, San Francisco's environmental code expressly provides that the Precautionary Principle "does not impose specific duties upon any City employee or official to take specific actions." (S.F. Environmental Code, § 104.) Further, it states that the Precautionary Principle may not "provide any basis for any other judicial relief including, but not limited to a writ of mandamus or an injunction." (*Ibid.*) Accordingly, even if the City's approach to the Beach Chalet project were in violation of its own Precautionary Principle, this would not require reversal.

C.    *Consideration of Alternatives to SBR Infill*

Petitioners Second CEQA count alleges that the City abused its discretion by failing to consider alternatives to synthetic turf using SBR infill. "CEQA contains a 'substantial mandate' requiring public agencies to refrain from approving projects with

30

significant environmental effects if 'there are feasible alternatives or mitigation measures' that can substantially lessen or avoid those effects." (*County of San Diego v. Grossmont-Cuyamaca Community College Dist.* (2006) 141 Cal.App.4th 86, 98, italics omitted, quoting *Mountain Lion Foundation v. Fish and Game Commission* (1997) 16 Cal.4th 105, 134.) Because the EIR concluded that the SBR infill would not produce significant effects, and because we have rejected petitioners' challenges to these conclusions, the EIR was not required to examine feasible alternatives or mitigation measures to the use of SBR infill. (See, e.g., Guidelines, § 15126.6, subd. (b) ["Because an EIR must identify ways to mitigate or avoid the significant effects that a project may have on the environment [citation], the discussion of alternatives shall focus on alternatives to the project . . . which are capable of avoiding or substantially lessening any significant effects of the project . . . ."].)[16]

D.      *The EIR's Consideration of Alternatives to the Beach Chalet Project*

Petitioner's Sixth CEQA count alleges that the EIR contained an inadequate analysis of alternatives to the project that would have mitigated or eliminated the project's impact on the Beach Chalet Athletic Field's historic character. The EIR concluded that the project would have a significant and unavoidable impact on Beach Chalet Athletic Field's historic character due to the addition of "spectator seating, synthetic turf, and field lights." It is well established that "a project that may cause a

_____

[16] In their brief, amici argue that the EIR failed to adequately address the impact of light pollution that will result from the project. This contention, however, was not raised by petitioners in their operative third amended petition, in arguments to the trial court, or before this Court. "Generally, 'an amicus curiae accepts a case as he or she finds it . . . [¶] . . . [¶] . . . and [] additional questions presented . . . by an amicus curiae will not be considered.' " (*Rental Housing Owners Assn. of Southern Alameda County, Inc. v. City of Hayward* (2011) 200 Cal.App.4th 81, 95, fn.13, quoting *California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1274-1274.) "An amicus curiae ordinarily must limit its argument to the issues raised by the parties on appeal, and a reviewing court need not address additional arguments raised by an amicus curiae." (*Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 572.) For these reasons, we decline to address the argument.

substantial adverse change in the significance of an historical resource is subject to CEQA." (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 374 (*Eureka Citizens*).) CEQA provides that "public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects[.]" (§ 21002.) " 'Our Supreme Court has described the alternatives and mitigation sections as "the core" of an EIR.' " (*Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 597, quoting *Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1029.)

Petitioners argue that the City abused its discretion regarding the EIR's identification and consideration of alternatives to the Beach Chalet project on two grounds. First, they contend that the EIR failed to adequately consider a so-called "hybrid" alternative to the project. Second, they argue that the City failed to select the allegedly environmentally superior "Off-site Alternative" to the project. The City responds that the EIR considered a reasonable range of project alternatives as CEQA requires and that substantial evidence supports its rejection of the off-site alternative. We consider these arguments in turn.

1. *Selection of Alternatives*

"The lead agency is responsible for selecting a range of project alternatives for examination and must publicly disclose its reasoning for selecting those alternatives." (Guidelines, § 15126.6, subd. (a).) "There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason." (*Ibid.*) The "rule of reason" requires an EIR "to set forth only those alternatives necessary to permit a reasoned choice." (*Id.*, § 15126.6, subd. (f); *Goleta Valley, supra,* 52 Cal.3d at p. 566 ["CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose."].)

32

For purposes of the EIR, a "feasible" alternative is one that could accomplish "most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project." (Guidelines, § 15126.6, subd. (a).) " '[I]f a reasonable basis for the choices the agency makes is found in the EIR or elsewhere in the record, a reviewing court will defer to the agency's selection of alternatives.' " (*Center for Biological Diversity v. Department of Fish and Wildlife* (2015) 234 Cal.App.4th 214, 256, quoting Kostka & Zischke, *supra*, § 15.17, pp. 15-24.) We will uphold an agency's choice of alternatives unless they are "manifestly unreasonable and . . . do not contribute to a reasonable range of alternatives." (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1265 (*Federation of Hillside*).)

The EIR identified eight project objectives: (1) increase the amount of athletic play time on the Beach Chalet Athletic Fields by renovating the existing athletic fields and adjacent warm-up areas; (2) improve public access to the Beach Chalet Athletic Fields by adding new pathways, increasing the size of the existing parking lot, providing a formal drop-off area, and providing bicycle racks; (3) increase ground-sports athletic opportunities on the north side of San Francisco commensurate with improvements elsewhere in San Francisco; (4) provide a safe, optimal recreation facility and amenities for athletes, spectators, and park users by renovating the existing Beach Chalet Athletic Fields and the existing restroom building, adding bleachers, and installing a new plaza area with visitor amenities; (5) reduce ongoing maintenance and resource needs; (6) comply with current Americans with Disabilities Act (ADA) requirements; (7) improve safety and increase nighttime use of the west end of Golden Gate Park by installing new lighting and bringing more recreation facility users to the area; and (8) remain consistent with the Golden Gate Park Master Plan.

In light of these objectives, the EIR analyzed four alternatives in detail. The first was the "no project" alternative that the CEQA Guidelines requires a lead agency to examine. (Guidelines, § 15126.6, subd. (e)(1) ["The specific alternative of 'no project' shall also be evaluated along with its impact.].) A "no project" alternative means not

33

going forward with the project at all. The second alternative addressed in the EIR, the "Off-site Alternative," involved the construction of renovations to athletic fields located at West Sunset Playground (eight blocks away from the Beach Chalet facilities) instead of the Beach Chalet Athletic Fields. The third alternative, the "Grass Turf with Reduced Lights Alternative," called for SFRPD to construct most of the improvements described in the project, but to minimize the impact on historical resources by using natural grass fields, fewer field lights, smaller-scale removable seating, and circulation paths composed of decomposed granite. The final alternative, the "Synthetic Turf without Lights Alternative," called for construction of all of the renovations to the Beach Chalet Athletic Fields, with the exception of field lighting.

After the publication of the draft EIR, the City received comments advocating a compromise or so-called "hybrid" alternative. The hybrid alternative called for rebuilding the four Beach Chalet athletic fields with natural grass (with improved drainage and gopher-proofing) and renovation of West Sunset Playground with synthetic turf and night sports lighting. The final EIR contains approximately 20 pages of comments explaining the potential benefits of the hybrid alternative. In responding to these comments about the hybrid alternative, the final EIR stated that the "suggested alternative would be within the range of alternatives analyzed in the EIR" because the "Off-site Alternative would include continued use of the existing grass field at the Beach Chalet Athletic Fields. Under this alternative, turf repair and replacement, gopher control, and other maintenance activities would continue to occur and could include use of improved turf maintenance. . . . Thus, the Off-Site Alternative incorporates the potential for consideration of an Off-site Alternative, with renovation of the Beach Chalet Athletic Fields with grass turf and no lights." In its analysis to the Board of Supervisors, the Planning Department stated that the "hybrid alternative is within the range of alternatives analyzed in the EIR and does not need to be analyzed as a separate alternative. Specifically, the hybrid alternative would be similar to a combination of . . .

Alternative 2, the Off-Site Alternative and Alternative 3, the Grass Turf with Reduced Lights Alternative."

Petitioners argue that the City abused its discretion in refusing to analyze the hybrid alternative in the EIR. They contend that none of the four alternatives analyzed in the EIR meet all of the project's objectives, while the hybrid alternative does. The City responds that by considering the Off-site Alternative as well as two on-site alternatives with reduced development, the EIR examined a "reasonable range" of alternatives. It contends that the hybrid alternative was a permutation of alternatives already included in the EIR and that the final EIR contained extensive discussion and analysis of the hybrid alternative.

In support of their legal challenge to the range of alternatives examined in the EIR, petitioners rely on *Watsonville Pilots Association v. City of Watsonville* (2010) 183 Cal.App.4th 1059 (*Watsonville Pilots*). There, the EIR for the City of Watsonville 2030 General Plan identified significant impacts due to anticipated growth: increased population, loss of farmland, and increased water usage. (*Id.* at p. 1067.) Watsonville's EIR identified three alternatives (including the required no-project alternative) to the 2030 General Plan, none of which included a reduction in growth. (*Id.* at p. 1088.) Watsonville argued that consideration of the no-project alternative was sufficient consideration of a reduced-growth alternative, even though it met almost none of the project's objectives. The court rejected this argument, noting that the "purpose of an EIR is *not* to identify alleged alternatives that meet few if any of the project's objectives so that these alleged alternatives may be readily eliminated." (*Id.* at p. 1089.) Instead, the "key to selection of the range of alternatives is to identify alternatives that meet most of the project's objectives . . . but have a reduced level of environmental impacts." (*Ibid.*) Under this standard, the court found that Watsonville's failure to consider a reduced-growth alternative was an abuse of discretion because analysis of this alternative "would have provided the decisionmakers with information about how most of the project's

35

objectives could be satisfied without the level of environmental impacts that would flow from the project." (*Id.* at p. 1090.)

*Watsonville Pilots* is distinguishable because the EIR in this case provided the City's decisionmakers with sufficient information about feasible project alternatives. As an initial matter, as described above, the final EIR contains extensive information regarding the hybrid alternative. Further, the final EIR noted that the hybrid alternative was essentially a combination of the Off-site Alternative and the grass turf with reduced lights alternative – both of which were analyzed in the EIR in detail. The final EIR identified the possibility of combining aspects of both of these alternatives: "[T]he Off-Site Alternative incorporates the potential for consideration of an Off-Site Alternative, with renovation of the Beach Chalet Athletic Fields with grass turf and no lights."

In addition, the EIR discussed how both the off-site and grass turf with reduced lights alternatives met many of the project's objectives, while minimizing or eliminating the significant impact to Beach Chalet's historic resources. The EIR found that the Off-Site Alternative would partially achieve the project objectives of providing safe, optimal recreation facilities and amenities for athletes and spectators, reduce ongoing maintenance and resource needs, and comply with ADA requirements. It also noted that the Grass Turf with Reduced Lights Alternative would meet most of the project objectives, in full or in part, such as increasing ground-sports opportunities on the north side of San Francisco; improving public access to the Beach Chalet Athletic Fields; and providing safe, optimal recreation facilities for athletes and spectators. Accordingly, this is not a case where the City identified only alternatives that met "few if any of the project's objectives" so that they could be readily eliminated. (*Watsonville Pilots*, *supra*, 183 Cal.App.4th at p. 1089; see also *Habitat and Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1305 [finding EIR inadequate where it "failed to discuss *any* feasible alternative . . . that could avoid or lessen the significant environmental impact of the project].)

36

We conclude that the City's choice of alternatives was not manifestly unreasonable. (*Federation of Hillside*, *supra*, 83 Cal.App.4th at p. 1265.) The City provided a reasonable range of alternatives and the EIR contained sufficient information to inform the decisionmakers and the public of various alternatives to the project. (*Ibid.*) There was no abuse of discretion.

2. *Rejection of Off-Site Alternative*

In a separate argument, petitioners contend that the City was required to select the Off-site Alternative at West Sunset Playground as the "environmentally superior alternative." Petitioners assert that this alternative would eliminate the impact to Beach Chalet's historic resources. They argue that the City's conclusion that the Off-site Alternative was infeasible within the meaning of CEQA is not supported by substantial evidence. The City responds that substantial evidence supports its rejection of the Off-site Alternative because this alternative did not meet most of the project objectives.

Before a public agency may approve a project for which an EIR identifies a significant environmental impact, the agency must make a finding that "[s]pecific economic, legal, social, technological, or other considerations . . . make infeasible the mitigation measures or alternatives identified in the [EIR]." (§ 21081, subd. (a)(3).) This finding must be supported by "substantial evidence in the record." (*Id.*, § 21081.5.) As referenced above, "substantial evidence" means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) In reviewing for substantial evidence, we presume the agency's findings are correct and resolve all conflicts and reasonable doubts in favor of the findings. (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 881-882.)

In rejecting the off-site alternative as infeasible, the Planning Commission found it "fail[ed] to meet most of the Project objectives" and that, were it adopted, the "Beach Chalet Athletic Fields would continue to be used and would continue to degrade." The

37

Commission specifically noted the off-site alternative would not (1) increase the amount of athletic play time on the Beach Chalet field by renovating the fields, (2) increase the safety and use of the west end of Golden Gate Park by installing lights, (3) improve public access to the Beach Chalet fields, or (4) increase ground-sports athletic opportunities on the north side of San Francisco. Thus, the Commission concluded that the "Off-Site Alternative would only partially achieve some of the Project objectives while all of the same mitigation measures would be required."

An agency is free to reject an alternative as infeasible if it is inconsistent with project objectives. For example, in *Jones v. Regents of University of California* (2010) 183 Cal.App.4th 818 (*Jones*), the court found that "substantial evidence supports the determination that the off-site alternative would not achieve the Lab's objectives of creating a more campus-like setting with the goal of enhancing collaboration, productivity, and efficiency." (*Id.* at pp. 828-829.) Here, as the City correctly argues many project objectives for the Beach Chalet project were directed at developing and improving the Beach Chalet facilities to increase their use and accessibility. Substantial evidence supports the Planning Commission's conclusions that the Off-site Alternative would not meet these objectives for the simple reason that it involved the development of a separate facility at a different location with little to no improvement of the Beach Chalet facilities. For example, the EIR noted a number of factors that limited the use of the Beach Chalet fields, such as the fact that they are closed during the night because of the lack of lighting, during and after rain due to the lack of drainage, and for three months out of the year to permit regrowth of the natural grass. Nothing in the Off-site Alternative would have changed these conditions to allow for greater use of the Beach Chalet fields. Substantial evidence therefore supports the Commission's conclusion that the off-site alternative would only partially achieve some of the project's objectives.

In their reply brief, petitioners argue that the City was not free to reject the off-site alternative simply because it was off-site, because otherwise "the CEQA requirement that an off-site alternative must be analyzed would be rendered meaningless." However, there

is no such broad requirement. In *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957 (*California Native Plant Society*), the court recognized that the CEQA regulations required an EIR to describe a range of "reasonable alternatives to the project, or to the location of the project." (*Id.* at p. 980.) The court stated that the use of the disjunctive implied that " 'an agency may evaluate on-site alternatives, off-site alternatives, or both.' [Citation.] The Guidelines thus do not require analysis of off-site alternatives in every case. Nor does any statutory provision in CEQA 'expressly require a discussion of alternative project locations.' " (*Id.* at p. 993.) "[W]hen a public agency seeks to expand operations at an existing location, in many cases no purpose would be served by studying options for expanding someplace else." (Kostka & Zischke, § 15.27, at p. 15-34; see also *Jones*, *supra,* 183 Cal.App.4th at p. 828 ["The objectives of the current project are to expand and update the hill site even further and to consolidate Lab staff . . . . A complete off-site alternative, however, would result in the division of facilities and staff and would be contrary to the objective of creating a more cohesive Lab atmosphere."].)

Petitioners argue, however, that the final EIR itself found that the Off-site Alternative was feasible and would meet most project objectives. They rely on the following statement in the final EIR: "The EIR includes analysis of an off-site alternative (West Sunset Playground) that would: (1) attain *most* of the project's basic objectives; (2) *avoid or substantially lessen* one or more of the significant environmental impacts of the proposed project; and (3) be feasible." Petitioners claim that this statement in the final EIR directly contradicts the Planning Commission's infeasibility finding and as a result, the Planning Commission's conclusion is without support in the record. Petitioners rely on *California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173 (*California Clean Energy*). There, the court found that the City of Woodland had relied on an unsupported rationale for finding an alternative to a regional shopping center development project infeasible. The EIR had rejected a "Mixed-Use Alternative" as economically infeasible. The City of Woodland, however, eventually approved the

39

project and rejected the mixed-use alternative on the ground that it was *environmentally inferior.* (*Id.* at p. 205.) The court stated: "The City adopted a rationale unsupported by its EIR analysis. The City's unexplained switch from a rationale of economic infeasibility to environmental inferiority as the basis for rejecting the mixed-use alternative conflicts with CEQA's requirement to 'disclose "the 'analytic route . . . the agency traveled from evidence to action' ". . . .' [Citations.]" (*Ibid.*)

Unlike in *California Clean Energy*, the EIR here did not advance a position only to have the City turn around and adopt a different position that the EIR did not discuss. Rather, the EIR examined the extent to which the off-site alternative would, and would not, meet the project's objectives. The Planning Commission determined that the off-site alternative would not meet most of the project objectives – namely those associated with the development and expansion of the Beach Chalet facilities. As discussed above, this finding is supported by substantial evidence.

Further, even if it is assumed that the final EIR had made a finding that the off-site alternative was feasible and would meet most of the project objectives, this finding would not have been binding on the City's decisionmakers. In *California Native Plant Society,* the appellants argued, similar to the petitioners in this case, that a city "cannot in a public process [the EIR] tell the public that there are feasible alternatives and then at the end of the process [project approval] make a contrary conclusion." (*California Native Plant Society, supra,* 177 Cal.App.4th at p. 998.) The court rejected this argument as flawed because "[t]he issue of feasibility emerges at two distinct points in the administrative review process: first, in the EIR, and next during project approval." (*Ibid*.) When assessing feasibility in connection with the alternatives analysis in the EIR, the "question is whether the alternative is *potentially* feasible." (*Id.* at p. 999.) While the EIR must identify alternatives as potentially feasible, the "decision-making body 'may or may not reject those alternatives as being infeasible' when it comes to project approval." (*Ibid.*) When it comes time to approve a project, an agency's "decision-making body evaluates whether the alternatives are *actually* feasible." (*Ibid.*) It is at this later stage that the

agency must consider whether specific economic, legal, social, technological, or other considerations make the alternative identified in the environmental impact report. (*Id.* at p. 1000). "Broader considerations of policy thus come into play when the decisionmaking body is considering actual feasibility than when the EIR preparer is assessing potential feasibility of the alternatives." (*Ibid.*)

The statement in the final EIR upon which petitioners rely was made in the context of explaining the range of alternatives adopted by the EIR and why additional off-site alternatives did not need to be discussed. In fact, the statement was essentially restating the CEQA Guideline standard for when an alternative should be discussed in the EIR. (See Guidelines, § 15126.6, subd. (a) ["An EIR shall describe a range of reasonable alternatives to the project . . . which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project . . . ."].) As the *California Native Plant Society* court noted, the EIR's finding that the Off-site Alternative met this standard did not, and could not, bind the City. (*California Native Plant Society*, *supra*, 177 Cal.App.4th at pp. 998-999.)

E.      *The Scope of the Administrative Record*

The administrative record in this matter is over 52,000 pages. Petitioners contend the trial court erred in ruling that the administrative record did not include documents or submissions sent to individual members of the Board of Supervisors (Board) concerning the project prior to the time the project was before the Board for review.

1.      *Background*

Neither the petitioners nor the City have provided an adequate background regarding their dispute over the scope of the administrative record. They have left it to us to scour the voluminous trial court record in an attempt to place the challenged trial court order in its proper procedural context.

We glean from the trial court's record in this case that the dispute over the scope of the administrative record dates back to October 24, 2012, when petitioners served their first Public Records Act request on the City. This request tracked the categories of

41

documents that section 21167.6, subdivision (e) identifies for inclusion in the administrative record. On November 6, 2012, counsel for the City responded to a letter from counsel for petitioners regarding preparation of the administrative record, explaining the process it planned to follow and making suggestions to minimize cost and delay. As relevant here, the City proposed that "Board of Supervisor files would include documents related to Board file number 120692, which culminated in approval of Motion number M12-79, which upheld the Planning Commission's certification of the FEIR." The Board opened file number 120692 on June 12, 2012, when petitioners filed their administrative appeal to the Board seeking review of the Planning Commission's certification of the project's EIR. It thus appears that the City's November 6, 2012, letter meant that the administrative record would not include documents or submissions provided to it prior to June 12, 2012. Apparently, petitioners never objected to this proposal.

The record suggests that an informal conference occurred on June 14, 2013, between counsel for the parties and the trial court, although no official account or transcript of this conference exists. Based on the parties' subsequent filings in the trial court, it appears that during this informal conference, petitioners requested that the City collect and produce electronic and paper files from individual members of the Board relating to the Beach Chalet project, beginning with the City's notice of preparation of its EIR on February 1, 2011, on the ground that such documents were essential components of the administrative record. Based on subsequent emails between counsel for both parties, it appears that the result of this informal conference was the trial court "directed the [City] to collect *only* emails from the official email account of each Supervisor (not staff) from the time period beginning January 1, 2012, until July 10, 2012, when the Board affirmed certification" of the EIR.

Shortly after the informal conference, the City and petitioners filed briefs regarding the scope of the administrative record. These briefs addressed whether correspondence and submissions to individual Board members were properly part of the

42

administrative record, even if they had not been presented to the full Board during its deliberations regarding the project.   On July 2, 2013, the trial court held a hearing on an unrelated motion for a protective order filed by the City.  Although not entirely clear, it appears from the parties' subsequent correspondence that the court heard argument on the scope of the administrative record based on the parties' June 20 briefing at this hearing.

On July 17, 2013, petitioners served their third Public Records Act request in this case.  This request differed from the October 24, 2012, request.  Whereas the October 2012 request tracked the language contained in section 21167.6, subdivision (e), the July 2013 request specifically sought any and all "correspondence (including but not limited to letters, memoranda, electronic mail messages, text messages, telefax communications, and any other correspondence) and other communications referring or related to the Beach Chalet Project" that were sent or received by members of the Board or the clerk of the Board between February 2, 2011, and September 13, 2012.  In an email to petitioners' counsel, counsel for the City urged the petitioners to withdraw this Public Records Act request.  He stated that the request "involves the same types of documents that petitioners urged the Court to require San Francisco to provide and to include in the administrative record."  He noted that the court had already directed the City to produce a "limited subset" of these documents during the informal conference, ordered briefing on the scope of the administrative record, and heard argument on this issue at the July 2, 2013 hearing.  Counsel stated that the Public Records Act request "greatly expands the scope of documents that the Court authorized" and that if petitioners did not withdraw the request, the City would seek the trial court's intervention and protection.  Petitioners responded by stating they would not withdraw their request.  The parties agreed by email that the City would present an ex parte protective order to the trial court on July 26, 2013.

On July 19, 2013, the City's counsel emailed petitioners' counsel regarding the production that the court had apparently directed at the June 14 informal conference. This letter stated that to "comply with the Court's directions at the June 14 conference," the City had retrieved backup tapes for the Board members' email accounts between

43

January and July 2012. The letter stated that the estimated cost for extracting the emails from the backup tapes would be $35,000 and that the City would seek to recover this cost from petitioners if the City ultimately prevailed. On July 22, 2013, petitioners' counsel responded stating that he believed it was "improper and contrary to law" for the City to state that it would seek to recover the $35,000 if it prevailed. Nevertheless, counsel stated that the "Sierra Club cannot run the risk of such litigation costs. Unless you withdraw your threat to seek litigation costs for the production of these documents, Petitioner Sierra Club has no alternative but to ask you *not to proceed* with any production of documents , including this email extraction, for which you intend to recover litigation costs." (Emphasis added.)

On July 26, 2013, the City filed an ex parte application for protective order regarding petitioners' third Public Records Act request. The City argued that the court should interpret petitioners' public record act request in light of petitioners' obligation under CEQA to limit costs in the preparation of the administrative record. Further, the City renewed its argument that under CEQA, the administrative record does not include correspondence to or from individual supervisors prior to the Board's consideration of the project. The trial court heard the parties' arguments regarding the ex parte application at a hearing later that afternoon. The portion of the hearing addressing the ex parte application was not reported.

Later in the day, the trial court issued a written order entitled "Order Regarding Scope of Administrative Record." The court ordered that section 21167.6, subdivision (e) did not require the City to supplement the administrative record with documents submitted to individual members of the Board because petitioners had not shown that documents submitted to a single supervisor were presented to or considered by the Board in its deliberations or decision whether to affirm the Planning Commission's certification of the FEIR. In reaching this conclusion, the trial court reviewed examples of documents petitioners had identified as having been submitted to individual Board members and made factual findings that many did not relate to the Beach Chalet project or to the City's

44

compliance with CEQA, and that the "correspondence to individual supervisors would be duplicative and/or cumulative of material already in the administrative record, such that their omission from the record would cause no prejudice." Finally, the trial court found that "petitioners never objected to the City's proposal" that the Board of Supervisors portion of the administrative record would be limited as stated in the November 6, 2012 letter, described above. The court concluded that "[t]he parties' agreement to limit the Board of Supervisor documents to 'documents related to Board file no. 120692' appears inconsistent with any requirement to include documents from the Board of Supervisors that predate Petitioners' June 2012 administrative appeal."

2. *Discussion*

On appeal, petitioners contend that the trial court erred in finding that "letters, emails or correspondence sent to individual members of the Board of Supervisors concerning the Beach Chalet Project" was not part of the administrative record. Petitioners argue that such documents are required parts of the administrative record under section 21167.6, subdivision (e).[17] The City disputes petitioners' interpretation of

---

[17] Specifically, petitioners rely on section 21167.6, subdivision (e)(3), (6), (7), and (10). Together, these subdivisions provide: "The record of proceedings shall include, but is not limited to, all of the following items: . . . [¶] (3) All staff reports and related documents prepared by the respondent public agency and written testimony or documents submitted by any person relevant to any findings or statement of overriding considerations adopted by the respondent agency pursuant to this division; . . . [¶] (6) All written comments received in response to, or in connection with, environmental documents prepared for the project, including responses to the notice of preparation; [¶] (7) All written evidence or correspondence submitted to, or transferred from, the respondent public agency with respect to compliance with this division or with respect to the project; . . . [¶] (10) Any other written materials relevant to the respondent public agency's compliance with this division or to its decision on the merits of the project, including the initial study, any drafts of any environmental document, or portions thereof, that have been released for public review, and copies of studies or other documents relied upon in any environmental document prepared for the project and either made available to the public during the public review period or included in the respondent public agency's files on the project, and all internal agency communications, including staff notes and memoranda related to the project or to compliance with this division."

section 21167.6, subdivision (e) and argues that even if the trial court erred in excluding these documents from the administrative record, petitioners have failed to show any prejudice resulting from this error.

"[T]he Court of Appeal does not directly review the agency's decisions about what to include in the administrative record. Instead, it reviews the trial court's decision on a party's motion relating to the administrative record. It reviews the trial court's findings of fact for substantial evidence and its conclusions of law de novo." (*Citizens for Ceres v. Superior Court* (2013) 217 Cal.App.4th 889, 910 (*Ceres*).)

The contents of the administrative record defined by subdivision (e) of section 21167.6 are mandatory: "[t]he administrative record *shall* include the listed items." (*Ceres, supra,* 217 Cal.App.4th at p. 909.) The "list is nonexclusive; the administrative record's contents include, but are not limited to, the listed items." (*Ibid.*) Further, "the administrative record as defined is very expansive." (*Ibid*.) Courts have recognized that section 21167.6 "contemplates that the administrative record will include pretty much everything that ever came near a proposed development *or* to the agency's compliance with CEQA in responding to that development." (*County of Orange v. Superior Court* (2003) 113 Cal.App.4th 1, 8; see also *Eureka Citizens*, *supra*, 147 Cal.App.4th at p. 367 [same].)

Ultimately, we need not determine whether the trial court erred in its construction of section 21167.6, because we conclude that petitioners have failed to show any prejudice from the exclusion of the correspondence in question. Our state Constitution provides that "[n]o judgment shall be set aside . . . in any cause, on the ground of . . . the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) Under this provision, a party arguing that evidence was improperly rejected bears the burden of demonstrating that they were prejudiced by the error. (*Easterby v. Clark* (2009) 171

Cal.App.4th 772, 783; *Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1038.) This constitutional provision applies to disputes over the scope of a CEQA administrative record. (*Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 308 (*City of Lodi*).)

As we have noted, the administrative record in this matter is extensive, comprising over 52,000 pages of documents. The trial court, reviewing a sampling of documents that petitioners asserted had been submitted to individual Board members, made a factual finding that the documents either did not relate to the Beach Chalet project or were cumulative or duplicative of material already in the administrative record. As a result, the trial court found that petitioners had failed to show that omission of such documents would cause prejudice. The trial court was correct that omission of duplicative material from the administrative record would cause no prejudice. (See *Environmental Protection Information Center v. California Department of Forestry and Fire Protection* (2008) 44 Cal.4th 459, 488 [finding no prejudice for omission of documents which were duplicative of information already contained in the EIR].)

On appeal, the petitioners have not challenged the trial court's factual finding that the documents they submitted were cumulative or duplicative of material already in the record. Instead they argue "there is no way to determine if the exclusion [of the correspondence to individual Board members] is 'harmless error' since neither [petitioners] nor the Court have seen the excluded correspondence." In essence, petitioners concede that they have failed to demonstrate any prejudice from the omission of correspondence to individual Board members from the administrative record, but contend it was not possible for them to do so. We are unpersuaded.

First, as detailed above, following the informal conference on June 14, 2013, petitioners had the opportunity to obtain copies of relevant emails from the individual Board members' official email accounts over a six-month period – a substantial amount of the correspondence they now contend was erroneously omitted from the administrative record. After the City threatened to seek recovery of the costs associated with producing

these emails if they prevailed in this matter, petitioners expressly withdrew their request for the emails. Petitioners withdrew their request without ever seeking the intervention of the trial court, either to enforce the arrangement from the informal conference or to seek review of the City's assertion that it would seek to hold petitioners liable for the costs associated with the production. Accordingly, petitioners had the opportunity to see a large portion of the correspondence at issue in this appeal – an opportunity that would have aided them in demonstrating prejudice should the correspondence be excluded – but declined that opportunity.

Second, the court in *City of Lodi* addressed a similar prejudice argument to that raised by petitioners in this matter. In that case, appellants raised a number of challenges under CEQA to the City of Lodi's approval of a project, including a claim that the City of Lodi had wrongfully excluded a number of emails from the administrative record on an erroneous claim of privilege. (*City of Lodi, supra,* 205 Cal.App.4th at p. 305.) The appellate court agreed that the deliberative process privilege did not apply and that the emails should have been included in the administrative record, but found that the appellants had not demonstrated prejudicial error. (*Id.* at p. 307.)

The appellants in *City of Lodi* had argued that the "act of improperly withholding the documents '[was] itself prejudicial' " and that "requiring [appellants] 'to prove prejudice without ever having seen the improperly withheld documents imposes an *impossible* burden on CEQA petitioners.' " (*City of Lodi, supra,* 205 Cal.App.4th at p. 308.) The court rejected this argument, finding that "[t]he answer to [appellant's] predicament was to seek writ review of the trial court's December 14, 2009, ruling on the motion to augment the administrative record, in which the court determined the deliberative process privilege applied." (*Ibid.*) Appellants "could have sought writ review of the court's ruling improperly excluding documents based on the deliberative process privilege by arguing that review by appeal was inadequate. It was inadequate because without having seen the documents, [appellants] could not carry [their] burden on appeal to show prejudice." (*Ibid.*) The court noted that appellant's position, taken to

48

its extreme was that "anytime even one insignificant document is erroneously excluded from the administrative record, reversal is required." (*Id.* at p. 309.)

If petitioners disagreed with the trial court's interpretation of section 21167.6 contained in its "Order Regarding Scope of Administrative Record," they could have sought writ review of that order. "[W]here [petitioners] chose to proceed on appeal . . . [they] cannot claim it is impossible to demonstrate prejudice (for its lack of ability to see the documents) because [they] created [their] own predicament by failing to seek writ review. An appellant's burden to prove prejudicial error is well established. Indeed it is part of our state's Constitution. Because [petitioners have] failed to carry that burden, it is not entitled to reversal on appeal." (*City of Lodi, supra,* 205 Cal.App.4th at p. 311.)

F.     *Demurrer to Petitioner's Fourth CEQA Count.*

In their Fourth CEQA count, petitioners alleged that the City did not exercise its independent judgment in "analyzing, selecting and describing the artificial turf selected for the Beach Chalet Project in the EIR." Petitioners alleged that in 2006 the City and the Foundation entered into a memorandum of understanding (MOU) that "delegates or gives to [the Foundation] certain rights as to selection, construction and maintenance of the artificial turf;" "the right to control the acquisition of such artificial turf" and to select the contractor to install and maintain the turf; and "a joint right, with the City, to select the sites where this artificial turf will be installed." Petitioners alleged that, in this way, the City impermissibly delegated to the Foundation the decision-making regarding these aspects of the project and failed to exercise its independent judgment. Petitioners also alleged facts showing a close relationship between the City's Recreation and Parks Department and the Foundation.

The City and the Foundation demurred to this count on grounds that it failed to state a cause of action and that it was untimely.[18] The trial court sustained the demurrer without leave to amend on the ground that it failed to state a cause of action.

---

[18] The City and the Foundation demurred to several of petitioners' CEQA causes of action. Only petitioners' Fourth CEQA count is at issue in this appeal.

49

" ' "A demurrer tests the legal sufficiency of the complaint. . . ." [Citations.] On appeal from a dismissal after an order sustaining a demurrer, we review the order de novo, exercising our independent judgment about whether the complaint states a cause of action as a matter of law. [Citations.] We give the complaint a reasonable interpretation, reading it as a whole and viewing its parts in context. [Citations.] We deem to be true all material facts properly pled. [Citation.] We must also accept as true those facts that may be implied or inferred from those expressly alleged. [Citation.] If no liability exists as a matter of law, we must affirm that part of the judgment sustaining the demurrer. [Citation.]' " (*Balikov v. Southern California Gas Co*. (2001) 94 Cal.App.4th 816, 819.) A demurrer to a cause of action alleging a violation of CEQA is subject to the same standard of review that applies to general demurrers raised in other types of lawsuits. (*Protect Agricultural Land v. Stanislaus County Local Agency Formation Commission* (2014) 223 Cal.App.4th 550, 557.)

"[W]hen [a demurrer] is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) Petitioners have the burden of proving that an amendment would cure the defect by " 'enumerat[ing] facts and demonstrat[ing] how those facts establish a cause of action.' " (*Total Call International, Inc. v. Peerless Ins. Co*. (2010) 181 Cal.App.4th 161, 166.)

The trial court correctly sustained the demurrer to Petitioner's fourth CEQA count. There is no dispute that an EIR, the environmental review of a proposed project, must reflect the lead agency's independent judgment and analysis. This does not mean, however, that the lead agency must actually *design* the project. Nothing in CEQA prohibits a developer or any applicant from proposing a project, including its size, height, materials, purpose, location, and various other specifications. The proposal simply triggers the need for CEQA review.

50

Petitioners rely on section 21082.1, which provides that a public agency is responsible for the draft EIR, final EIR, negative declaration, or mitigated negative declaration in CEQA proceedings. Specifically, petitioners cite subdivision (c), which states in part: "The lead agency shall do all of the following: [¶] (1) Independently review and analyze any report or declaration required by this division. [¶] (2) Circulate draft documents that reflect its independent judgment." (§ 21082.1, subd. (c).)

Petitioners also rely on two provisions in the CEQA Guidelines, sections 15084, subidvision (e) and 15090, subdivision (a)(3). Guidelines section 15084, subdivision (e) provides, "Before using a draft prepared by another person, the lead agency shall subject the draft to the agency's own review and analysis. The draft EIR which is sent out for public review must reflect the independent judgment of the lead agency. The lead agency is responsible for the adequacy and objectivity of the draft EIR." Guidelines section 15090, subdivision (a)(3) provides that prior to approving a project, the lead agency shall certify that "[t]he final EIR reflects the lead agency's independent judgment and analysis."

The court in *Friends of La Vina v. County of Los Angeles* (1991) 232 Cal.App.3d 1446, 1455 (*Friends of La Vina*), disapproved on other grounds by *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, considered the same statutory provision and CEQA Guidelines in rejecting a claim that the agency improperly delegated preparation of the EIR to the contractor who sought approval of a development project. The Court of Appeal reversed the trial court's grant of a writ of mandate and declaratory relief, holding that an agency may comply with CEQA by adopting EIR materials drafted by the applicant's consultant, so long as the agency independently reviews, evaluates, and exercises judgment over the documentation and the issues it raises and addresses. (*Friends of La Vina*, *supra*, 232 Cal.App.3d at pp. 1457-1458.)

Here, contrary to petitioners' arguments, their alleged facts, taken as true, do not show that the City ceded to the Foundation responsibility for determining project

51

alternatives, mitigation measures, or the project location, or studying the environmental impacts of a project, without the agency's independent review and analysis.

The cases petitioners cite do not advance their position. Two of the cases stand for the established principle that, under CEQA, "a public agency cannot charge a developer with the responsibility to study the impact of a proposed project. (*Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296.)" (*California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173, 194.) In *Sundstrom v. County of Mendocino*, *supra*, 202 Cal.App.3d at page 307, the agency violated its duty to assess environmental impact by delegating to the applicant the duty to conduct hydrology impact studies for construction of a sewage treatment plant. Similarly, in *California Clean Energy Committee v. City of Woodland*, *supra*, 225 Cal.App.4th at page 194, the agency failed to exercise its independent judgment by shifting responsibility for producing studies of the potential urban decay impact of the project, a shopping center, onto the developer. *Citizens of Goleta Valley v. Board of Supervisors* (1988) 197 Cal.App.3d 1167, 1180-1181 addressed the adequacy of the EIR's alternatives analysis and concluded that, under the particular circumstances, omission of consideration of whether there were feasible alternative sites rendered the EIR inadequate. And, in *People v. County of Kern* (1976) 62 Cal.App.3d 761, 775, the court held that the final EIR, which was prepared by the applicant's attorney, not the agency, was not a good faith response to adverse environmental comments.

Petitioners also alleged a close relationship between the Foundation and the SFRPD, specifically that several persons who were employed as managers and directors of SFRPD also served as part of the Foundation's board or "team." Petitioners contend this close relationship violated the CEQA requirement that the City exercise independent judgment and maintain objectivity toward the project. (See *Ceres, supra,* 217 Cal.App.4th at p. 898 ["[W]hen environmental review is in progress, the interests of the lead agency and a project applicant are fundamentally divergent. While the applicant seeks the agency's approval on the most favorable, least burdensome terms possible, the

52

agency is duty bound to analyze the project's environmental impacts objectively."].)  We are not persuaded.  The facts alleged do not establish that the City failed to exercise its independent judgment in reviewing the project.

Finally, although petitioners contend the trial court erred in denying leave to amend, they have not explained how the defect could be cured by amendment to state a cause of action.  It is petitioners' burden to prove such reasonable possibility, and they have not carried it.  (See *Blank v. Kirwan*, *supra*, 39 Cal.3d at p. 318.)

## DISPOSITION

The judgment is affirmed.

_____
Miller, J.

We concur:


_____
Kline, P.J.


_____
Richman, J.


A140891, *The Sierra Club v. City and County of San Francisco*